UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

BENNETT HASELTON,

Plaintiff,

v.

CITY OF SEATTLE, et al.,

Defendants.

No.  2:23-cv-0706-BJR

**ORDER (1) DENYING PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT AND (2) GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

## I.      INTRODUCTION

This matter comes before the Court on (1) a Motion for Partial Summary Judgment filed by Plaintiff Bennett Haselton, Dkt. No. 23; and (2) a Motion for Summary Judgment filed by Defendants Seattle Police Department ("SPD") officers Scott LaPierre, Jamison Maehler, Joshua Ziemer, Sandro Flemming, Shawn Ross, Josh Ginter, and Connor Hazelwood (the "Individual Defendants"), and municipal Defendant City of Seattle, Dkt. No. 28. Plaintiff seeks judgment in his favor against the Individual Defendants on his First and Fourth Amendment claims, brought under 42 U.S.C. § 1983. Defendants seeks dismissal of those claims against both the Individual Defendants and the City of Seattle. Having reviewed the briefs filed in support of and in opposition to both motions and the declarations and exhibits filed therewith, the Court finds and rules as follows.

ORDER - 1

## II.    BACKGROUND

The summer of 2020 was one of largescale and impassioned public demonstrations, widespread throughout the United States, calling for police reform and an end to systemic racism. The movement was spurred in particular by the murder of unarmed suspect George Floyd by Minneapolis police officers in May 2020. *See Black Lives Matter Seattle-King Cnty. v. City of Seattle, Seattle Police Dep't*, 466 F. Supp. 3d 1206, 1210, 1211 (W.D. Wash. 2020) ("The city and nation are at a crisis level over the death of George Floyd. One would be missing the point to conclude that the protests that are the subject of this motion are only about George Floyd. His death just happens to be the current tragic flashpoint in the generational claims of racism and police brutality in America.").

Seattle itself saw months of protests demanding an end to police abuses, beginning in late May, 2020, with the Seattle Police Department estimating demonstrations totaling thousands of participants. *See id*. ("On May 25, 2020, George Floyd died in the custody of four Minneapolis police officers. Since then, nationwide outrage and protest has ensued. Protests in Seattle began on May 29, 2020, just days after his death and continue to this day."); Timeline of Seattle's 2020 Protests, The Seattle Times, available at: projects.seattletimes.com/2020/local/protest-timeline/ ("Concentrated in downtown, the protests result in broken windows, car fires, dozens of arrests, a citywide 5 p.m. curfew and the statewide activation of the National Guard. The Seattle Police Department uses tear gas, flash-bang devices and pepper spray to control the crowds. Hundreds of people — many of them carrying firearms — also arrive in Snohomish in response to rumors that Antifa activists were planning to bring chaos to the community."); LePierre Decl., Ex. 1,

ORDER - 2

SPD "Incident Action Plan" ("IAP") at 2.[1] These events were largely peaceful, but unfortunately, on several highly publicized occasions, the demonstrations devolved into riots that resulted in extensive damage to property and injuries to people. *See id.* Several protests triggered responses by law enforcement that became the subject of excessive-force litigation. *Id.; see also, e.g., Black Lives Matter Seattle-King Cnty.,* 466 F. Supp. 3d at 1211, 1216 (enjoining City of Seattle "from employing chemical irritants or projectiles of any kind against persons peacefully engaging in protests or demonstrations"); *Benton v. City of Seattle*, No. 2:20-CV-01174-RAJ, 2020 WL 4584214, at *1 (W.D. Wash. Aug. 10, 2020); *Matter of Recall of Durkan*, 196 Wn. 2d 652, 654–55 (2020) ("Protests began in Seattle on May 29 and continued regularly thereafter. The protests were largely peaceful, but on multiple occasions, there were conflicts between the crowds and SPD. In response, SPD used "less lethal" methods of crowd control, including tear gas (also known as CS (chlorobenzylidenemalononitrile) gas), pepper spray (also known as OC (oleoresin capsicum) gas), and flash-bang grenades, multiple times beginning in late May. Numerous protesters were seriously injured, and tear gas seeped into the homes of local residents . . .. SPD officers also suffered injuries."). For purposes of the instant motions, it is not subject to reasonable dispute that in Seattle, throughout the summer of 2020, several demonstrations that began as peaceful Black Lives Matter and Defund the Police protests escalated to the point of chaos and violence, resulting in significant damage to property and in some cases, injuries to persons.

---

[1] Plaintiff objects to the IAP as both unauthenticated and hearsay. Pl.'s Resp. at 7, fn. 2. However, the declaration of Assistant City Attorney Dallas LePierre stating that he has "personal knowledge" that the IAP submitted as Exhibit 1 "is a true and correct copy of the Seattle Police Incident Action Plan for the Defend not Defund rally, dated August 1, 2020" is sufficient authentication of that document. In addition, the Court relies upon the IAP not as evidence of political violence in Seattle during the summer of 2020, but of SPD's intent in erecting the fencing around City Hall Plaza on the morning of the Defend rally. Contrary to Plaintiff's argument, it is therefore not being used to prove the truth of the matter asserted and is thus not hearsay in this context. Fed. R. Evid. 801.

ORDER - 3

On Saturday, August 1, 2020, a group of activists held a planned rally at Seattle City Hall Plaza called "Defend Not Defund SPD" to voice support for the Seattle Police Department and opposition to the "Defund the Police" movement. IAP at 2; Haselton Decl., ¶ 2.[2] City Hall Plaza, as the name suggests, is a large open-air plaza immediately adjacent to Seattle City Hall, bounded on three sides by public streets and on the fourth by City Hall. Compl., ¶ 4.1. As Plaintiff notes, "[a]ccording to the City's website, City Hall Plaza is 'a gathering place that is host to public activities, including summer concerts, health fairs and a variety of other civic events." Pl.'s MSJ at 2 (citing https://www.seattle.gov/civic-center). It is undisputedly a public forum.[3]

Plaintiff Bennet Haselton has alleged that he holds "progressive views," and "protest[s] police violence and misuse of power, and support[s] police accountability." Haselton Decl., ¶ 1; Compl., ¶ 1.1.   On the day of the Defend rally, Plaintiff went to City Hall to challenge the Defend message as a counter-protestor. Haselton Decl., ¶ 3. He found the area around City Hall Plaza lined with temporary crowd-control fencing, with access points staffed by Seattle Police Department officers, including Individual Defendants Sandro Fleming, Josh Ginter, Shawn Ross, and Connor Hazelwood. *Id*., ¶ 8. Other "Defund the Police" counter-protestors had gathered outside the fencing, while Defend protestors carried on within the fencing. As video footage taken by the Plaintiff shows, the waist-high barriers kept the groups physically separated, but

---

[2] For convenience the Court may hereafter refer to these groups, respectively, as "Defend" and "Defund," and in the context of the events of August 1, as the "protestors" and "counter-protestors."

[3] The parties disagree whether on the day of the rally, City Hall Plaza was a "traditional public forum," or more accurately characterized as a *limited* public forum, reserved for use by the Defend rally in what would have been a "private, permitted" event but for the state-wide "stay at home" decree issued in response to the COVID-19 pandemic. The disagreement is immaterial, as under either situation it appears the parties agree that the test for reasonable time, place, and manner restrictions, discussed *infra*, is the same.

ORDER - 4

generally allowed for each to see and hear the other. *See* Haselton Decl., Ex. 1, "checkpoint video," also available at:  https://www.youtube.com/watch?v=h0g3lTOKsxs.

After arriving, Plaintiff recognized a woman inside the closed protest area, Katie Daviscourt, as "a prominent social media personality and self-styled journalist," who had in the past publicly expressed views with which Plaintiff disagreed. Haselton Decl., ¶ 5. Wanting to discuss these views with her directly, he attempted to enter the plaza through one of the entrance points, but after making it apparent he did not share the views of the Defend protestors inside the fencing, was turned away by SPD officers. Plaintiff ultimately gained entrance through a different access point, "slip[ping] into the public park in the wake of a small group of pro-police attendees who were allowed to enter." Haselton Decl., ¶ 17 ("Unlike at the first checkpoint, this time I did not draw any attention to myself, did not challenge or ask questions about SPD's viewpoint discrimination, or otherwise express my viewpoint or opinions.").

Once inside the rally zone, Plaintiff approached Daviscourt, verbally confronting her about her recent social media post of video footage of a Black Lives Matter protestor getting attacked, a post that Plaintiff claims "celebrated political violence." Compl., ¶ 4.6; *see* Haselton Decl., Ex. 2, "arrest video," also available at: https://www.youtube.com/watch?v=EfJlzMZwTtw ("You shared the video of the guy in North Seattle walking up to the BLM protest . . . I just want to know if you have any regrets about that. Do you have any regrets about sharing that video?"). Daviscourt told Plaintiff to "go" and walked away, but Plaintiff followed her, continuing to attempt to engage her in discussion about her post. The incident attracted the attention of other protestors within the Defend rally zone, including one who attempted to interfere with the confrontation by thrusting a flag between Plaintiff and Daviscourt, and other Defend protestors who felt compelled to get involved. *Id*., at 1:04; 1:13 ("She didn't do anything either, so why are

ORDER - 5

you harassing her?"). Daviscourt walked towards several police officers and advised them that Plaintiff was "not one of us," at which point the officers advised Plaintiff to leave the plaza or risk arrest, telling him "leave or you're going to be arrested. That's your choice. You're harassing." *Id*., at 2:08.

When Plaintiff refused the officers' direction to leave, he was placed under arrest and charged with obstruction and trespass. LePierre Decl., Ex. 2. Plaintiff was taken to King County jail, where he spent several hours. The charges were later dropped. Haselton Decl., ¶ 28; LePierre Decl., Ex. 2 at 17-18.

## III.   DISCUSSION

### A. Summary Judgment Standard

"The court shall grant summary judgment if [a] movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A party moving for summary judgment "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). "If ... [the] moving party carries its burden of production, the nonmoving party must produce evidence to support its claim or defense." *Nissan Fire & Marine Ins. Co. v. Fritz Cos.*, 210 F.3d 1099, 1103 (9th Cir. 2000). "If the nonmoving party fails to produce enough evidence to create a genuine issue of material fact, the moving party wins the motion for summary judgment." *Id*.

ORDER - 6

**B. Defendants' Motion for Summary Judgment**

**1. Claims Against Individual Defendants**

The Individual Defendants move for dismissal of the claims against them on qualified immunity grounds. An officer sued under § 1983 is entitled to immunity from the lawsuit unless it is shown that the officer violated a statutory or constitutional right that was "clearly established" at the time of the challenged conduct. *Plumhoff v. Rickard*, 572 U.S. 765, 778 (2014). In resolving questions of qualified immunity, courts "engage in a two-step inquiry." *Peck v. Montoya*, 51 F.4th 877, 887 (9th Cir. 2022). One question is, "[t]aken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right?" *Saucier v. Katz*, 533 U.S. 194, 201 (2001). The other inquiry is whether, at the time of the alleged constitutional violation, that right was clearly established "in light of the specific context of the case." *Scott v. Harris*, 550 U.S. 372, 377 (2007). A court may use either prong of the qualified immunity test as the starting point. *Pearson v. Callahan*, 555 U.S. 223, 227 (2009). "If the answer to either question is 'no,' then the [officers] are entitled to qualified immunity." *Reichle v. Howards*, 566 U.S. 658, 663 (2012).

The Individual Defendants argue both that their actions were constitutional and that, even if they were not, those actions did not violate rights that were "clearly established" at the time. The Court begins and ends with the first inquiry, as it is determinative of claims against both the Individual Defendants and, as discussed *infra*, the City. In short, the Court finds that because the restrictions Plaintiff challenges here were constitutional, claims against the Individual Defendants must be dismissed.

ORDER - 7

### a. First Amendment Claims: Whether Officers' Actions Were Constitutional as Reasonable Time, Place, and Manner Restrictions[4]

The First Amendment to the U. S. Constitution provides that "Congress shall make no law . . . abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances." U.S. Const. Amend I. Under certain circumstances, however, it may be necessary—and constitutionally permissible— for governments to impose limited restrictions on the time, place, and manner of expression. As the Supreme Court has held, "even in a public forum the government may impose reasonable restrictions on the time, place, or manner of protected speech, provided the restrictions 'are justified without reference to the content of the regulated speech, that they are narrowly tailored to serve a significant governmental interest, and that they leave open ample alternative channels for communication of the information.'" *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989) (citing, inter alia, *Clark v. Community for Creative Non–Violence*, 468 U.S. 288, 293 (1984)).

Defendants argue that the August 1, 2020 separation of the Defend protestors and Defund counter-protestors, restricting the former to the zone within City Hall Plaza and the latter to the streets and sidewalk outside it, was a reasonable time, place, and manner restriction, permissible under the Constitution. The proper inquiry regarding a regulation defended as a time, place, or manner restriction is: (1) whether the regulation is content-neutral; (2) whether it is narrowly tailored to serve a compelling government interest; and (3) whether it leaves open ample

---

[4] Because the Court concludes that Defendants' actions here were a valid time, place, and manner restriction, whether they constituted a prior restraint is moot, and need not be addressed. *See Menotti*, 409 F.3d at 1142–43 ("Because we hold that Order No. 3 was a valid time, place, and manner restriction, we need not reach Appellants' contention that Order No. 3 was a prior restraint.") (citation omitted).

ORDER - 8

alternative channels of expression. If the regulation meets all three criteria, it is constitutional. *Id.* The Court examines each of these elements in turn.

*(1) Whether Restrictions Were Content-Neutral*

"The principal inquiry in determining content neutrality, in speech cases generally and in time, place, or manner cases in particular, is whether the government has adopted a regulation of speech because of disagreement with the message it conveys. The government's purpose is the controlling consideration. A regulation that serves purposes unrelated to the content of expression is deemed neutral, even if it has an incidental effect on some speakers or messages but not others." *Ward,* 491 U.S. at 791; *see also Menotti v. City of Seattle,* 409 F.3d 1113, 1128-29 (2005) (finding content-neutrality as a matter of law where city's order was "content neutral on its face" and its "purpose . . . had everything to do with the need to restore and maintain civic order, and nothing to do with the content of Appellants' message"). As the Ninth Circuit emphasized in upholding the restrictions on anti-WTO protests in *Menotti*, "[i]n assessing whether a restraint on speech is content neutral, we do not make a searching inquiry of hidden motive; rather, we look at the literal command of the restraint. Stated another way, . . . 'whether a statute is content neutral or content based is something that can be determined on the face of it; if the statute describes speech by content then it is content based.'" 409 F.3d at 1129 (citing *City of Los Angeles v. Alameda Books, Inc.,* that 535 U.S. 425, 448, (2002) (Kennedy, J., concurring)).[5]

---

[5] Plaintiff asks the Court, in the alternative, to deny Defendants' motion under Federal Rule 56(d), to allow for the taking of additional discovery. Because the content-neutrality inquiry asks whether a government regulation was "content neutral on its face," which it plainly was here, and explicitly does not involve "a searching inquiry of hidden motive," the Court denies this request. *Menotti,* 409 F.3d at 1128-29.

Here, the SPD's Incident Action Plan clearly articulated the "government's purpose," and it wasn't to limit Plaintiff's or other counter-protestors' speech at all, let alone to do so based on its content:

> Since May 30, 2020, SPD has needed to deploy significant resources to help manage protests, demonstrations, and marches that have been occurring throughout the City following the in-custody death of George Floyd in Minneapolis. Some events have involved numbers of some 50,000 people and for the most part events have occurred without violence or significant property damage. Notable exceptions have been rioting which involved violent acts, setting of fires, and looting in downtown Seattle on May 30 and ongoing skirmishes between protestors and police. . . . Most recently, acts of violence, injuries to Officers, and significant property damage has occur[r]ed during protests on Sunday July 19th and Saturday July 25. On Saturday August 1st, 2020 there is a planned demonstration called the "Defend not Defund Rally", which could draw extensive opposition. The event is scheduled from 1000 - 1200 hours at City Hall. *Fencing will be deployed* **in attempt to keep opposing groups separated.**

IAP at 2 (emphasis added). The IAP went on to emphasize "COMMANDERS INTENT: We will facilitate, in a content-neutral manner, the rights of all gathered, the freedom to assemble and express their views within the limited conditions necessary to address public safety concerns." *Id*. Consistent with this articulated purpose, an officer barring Plaintiff's access to the Defend rally zone told Plaintiff that "they're trying to avoid a confrontation. . . . Nobody's restricting you from saying anything." Haselton Decl., Ex. 1, at 4:20, 5:20; Schaeffer Decl., Ex. 1 at 2, 3. The evidence here demonstrates that the government's purpose was to allow both groups to engage in free expression, while preventing that competing expression from devolving into violence, which had happened—to disastrous effect—multiple times already that summer.

Plaintiff argues that unlike him, the Defend protestors were not restricted in "where they could be." Pl.'s Rep. at 7. Contrary to Plaintiff's assertion, however, it is not evident from the video footage that the Defend protestors were actively protesting outside the rally zone. Instead, the evidence supports Defendants' assertion that the restriction was a separation of the two

ORDER - 10

groups, not an intended preferencing of one group's rights over the other. It is not evident, as Plaintiff suggests, that the enclosed space within City Hall Plaza was necessarily a superior location to the surrounding streets and sidewalks; neither had special access to lawmakers (who were not in attendance), the media, or a public audience. The limitations that Plaintiff challenges here were imposed on both groups, without indication that one group was being favored over the other. As such, they were content-neutral. *See Olivieri v. Ward*, 801 F.2d 602, 607 (2d Cir. 1986) (A "barricaded enclosure for demonstrators and counterdemonstrators was not intended to limit the exercise of free speech. Instead, it is a practical device used by the police to protect those actively exercising their rights from those who would prevent its exercise. We conclude that this type of manner and place restriction is content-neutral since it is applicable to both groups.").

Plaintiff also argues that the SPD officers necessarily considered the content of his speech in deciding whether to admit him to City Hall Plaza on the morning of the Defend Not Defund rally. This is true; but it is not the test for determining content-neutrality. As noted above, the proper inquiry is whether the restriction is "*justified* without reference to the content of the regulated speech," not whether there must be inquiry into that content for the purpose of enforcing the restriction. *Ward*, 491 U.S. at 791 (emphasis added). The necessary consideration of the content of speech for purposes of furthering a content-neutral purpose does not make a government action content-based. *See Reform Am. v. City of Detroit*, 542 F. Supp. 3d 628, 645 (E.D. Mich. 2021), *aff'd sub nom. Reform Am. v. City of Detroit, Michigan*, 37 F.4th 1138 (6th Cir. 2022), *cert. denied*, 143 S. Ct. 448, 214 L. Ed. 2d 255 (2022) ("In this case, the police officers examined the content of each protest group's speech only to determine which side of the park they should stand on to best maintain safety and order. There is no evidence that the City or any individual officer was motivated by a disagreement with any protest group's viewpoint. The

ORDER - 11

City's justification was therefore content-neutral because it "serve[d] purposes unrelated to the content of expression.") (quoting *Ward*, 491 U.S. at 791).

The intent of the IAP, stated on its face and by the SPD officers, was to keep the two opposing groups separate to avoid an escalation of a conflict into violence. LePierre Decl., Ex. 1, IAP at 2. There is no evidence that the government's intent was to suppress speech it found objectionable, and Plaintiff's characterization of the two sides of the Defend/Defund debate as "pro vs. anti - government opinions," Pl.'s Resp. at 5, is an oversimplification of the issues to the point of inaccuracy; indeed, it was the recent actions of Seattle City Council to which the Defend protestors were voicing their opposition. *See* Haselton Decl., ¶ 4 ("The rally was meant to pressure City Council members to disavow their public commitments to reallocate a substantial portion of SPD's budget to community-based public safety initiatives and programing."). Remarkably, Plaintiff's video footage captures what actually appears to be one officer voicing support for Plaintiff's expression, even while deflecting Plaintiff's attempts to gain access to the fenced-off rally zone. Gesturing back and forth with his hands in a subtle show of understanding, the officer tells Plaintiff, "I know. You've been pretty cool. You and I are—I'm supporting what you're doing."[6] Haselton Decl., Ex. 1, at 3:35. In the absence of any evidence that the IAP was adopted or enforced by the Individual Defendants (or, for that matter, the City) "because of disagreement with the message" Plaintiff intended to convey, *Ward,* 491 U.S. at 791, the Court concludes the restrictions were content-neutral. *See Marcavage v. City of Philadelphia*, 481 F. App'x 742, 745 (3d Cir. 2012) (separation of counter-protestors from event participants was content-neutral because "[t]here is no evidence from any of the events that the City relocated

---

[6] Plaintiff's transcription of the footage has the officer saying "I know you've been pretty cool right? And I, I support you doing that." Schaeffer Decl., Ex. 1 at 3. The officer is wearing a mask and the audio includes significant ambient noise, but under either transcription, the sentiment is similar.

ORDER - 12

[plaintiff] because it disagreed with the content of his speech. While the officers did necessarily consider the content of [plaintiff's] speech when deciding to impose restrictions on him that would separate his counter-protest from event participants, this does not make the restrictions content-based.").

> (2) *Whether Restrictions Were Narrowly Tailored to Serve Significant Government Interest*

*(a) Narrow Tailoring*

A content neutral restriction is constitutional if it is narrowly tailored to serve a significant government interest. *Ward*, 491 U.S. at 799. "[T]he requirement of narrow tailoring is satisfied "so long as the ... regulation promotes a substantial government interest that would be achieved less effectively absent the regulation." *Id*. The restrictions challenged in this case met these criteria.

First, the Court finds that SPD's actions were narrowly tailored. Indeed, the restrictions in this case—in terms of their time, place, *and* manner—were substantially more narrow than those upheld in *Menotti*, which were imposed under similar circumstances of large-scale citywide demonstrations, marred by isolated but serious violence. *See* 409 F.3d at 1124-26. Unlike the no-protest zone challenged in *Menotti*, which lasted for several days, the rally and attendant restrictions here lasted for two hours on a single Saturday morning—a day on which it would not typically be expected that people—city lawmakers, staff, or the public—would be coming and going in great numbers from City Hall, particularly during the COVID-19 pandemic lockdown. The timing of the restrictions, the Court finds, was as narrow as reasonably possible under the circumstances to achieve the goal of mitigating the risk of violence.

As to the place of the restrictions, the section of City Hall Plaza designated for the Defend protestors and closed to Defund counter-protestors comprised a very limited area, made

ORDER - 13

up of less than one city block, again far more narrowly tailored than the approximate 50-block no-protest zone approved in *Menotti*. The area set aside for the planned rally left not only immediately adjacent sidewalks open for entirely unfettered counter-protest (*see generally* Haselton Decl., Ex. 1 (checkpoint video); photos at Defs.' MSJ at 5), but also literally *the entire rest of the city* for Haselton and other counter-protestors to demonstrate. As the photos, video footage, and Haselton's declaration testimony demonstrate, the two sides were well within both sight and earshot of each other and of passersby.

As to the manner of the restrictions here, it also compares favorably to the order approved in *Menotti*, under which all protest was prohibited. The IAP did not purport to restrict the manner of expression employed by either side. Indeed, in Plaintiff's video one can hear protestors and/or counter-protestors relying on bullhorns, obscenity, high-volume recordings, large signs, and other props to express their views. Haselton Decl., Ex. 1. The barriers erected by Defendants were a constitutionally appropriate means of ensuring that both sides could continue to do so, while also warding off potential violence. *See Bible Believers v. Wayne Cnty., Mich.*, 805 F.3d 228, 254 (6th Cir. 2015) (countenancing use of "barricades" and "cordon[ing] off the speakers" in order to separate plaintiffs voicing offensive speech from potentially violent hecklers) ("We do not presume to dictate to law enforcement precisely how it should maintain the public order. But in this case, there were a number of easily identifiable measures that could have been taken short of removing the speaker: *e.g.,* . . . erecting a barricade for free speech, as was requested; . . . or allowing the [plaintiffs] to speak from the already constructed barricade to which they were eventually secluded prior to being ejected from the Festival.").

*Gathright v. City of Portland* does not, as Plaintiff argues, dictate a different outcome in this case. The Ninth Circuit in *Gathright* invalidated a city ordinance that provided "[i]t is

unlawful for any person unreasonably to interfere with a permittee's use of a Park." 439 F.3d 573, 577 (9th Cir. 2006) (quoting Portland City Code ("PCC") 20.08.060). In *Gathright*, law enforcement had relied on the ordinance to remove a plaintiff engaged in expressive activity— delivering "jeremiads" at "privately sponsored, City-permitted events open to the public"—at the request of the events' permittees. *Id*. at 575. The court, assuming that the action was content-neutral and that the government had a significant interest in protecting the permittees' right to expressive activity, concluded that the ordinance was not narrowly tailored because it gave "permittees unfettered discretion to exclude private citizens on any (or no) basis," regardless of whether any exigent circumstances existed. *Id*., 439 F.3d at 577. That is not what happened here. First, in *Gathright*, the district court assumed that plaintiff was "threatened with arrest when he engaged in protected speech *at the periphery* of a permitted event," activity that was demonstrably allowed, unhindered, in this case. *Id*., 439 F.3d at 579 (emphasis added). More importantly, here the Defend protestors did not have a standing right, codified in a city ordinance, to silence others within the rally zone for "any (or no)" reason. Instead, what is at issue here, and what Daviscourt sought to enforce when she had the Plaintiff removed, was a two-hour-window in which one group could express its views on one side of the barriers, while the other could do so on the other side. Plaintiff's claim that counter-protestors were "silenced" as a consequence of the government action here is simply not borne out by Plaintiff's own evidence.

### (b) Significant Government Interest

The narrow restrictions at issue here also clearly served a significant government interest: the maintenance of public safety and order during a time of extraordinary social and political unrest. "No one could seriously dispute that the government has a significant interest in

ORDER - 15

maintaining public order; indeed this is a core duty that the government owes its citizens." *Menotti*, 409 F.3d at 1131. The test articulated in *Ward* and its progeny prescribes a balance, necessary in ordered society, between public safety and individual liberty, and the Court is confident that a constitutional balance was struck in this case. *See id.*, 409 F.3d at 1141-42 ("We recognize that our decision takes into account a balance of the competing considerations of expression and order. But we do not think the Constitution requires otherwise.").

Plaintiff criticizes the relative sparsity of evidence here that a Defend/Defund confrontation posed an actual risk of devolving into violence. The cases on which Plaintiff relies, however, rejected limitations on speech where there was "*no* basis in the record" for asserting that the purported danger would materialize. *See Kuba v. 1-A Agr. Ass'n*, 387 F.3d 850, 860 (9th Cir. 2004) (finding uncorroborated the asserted government interest in "preventing traffic congestion") (emphasis added); *see also Weinberg v. City of Chicago*, 310 F.3d 1029, 1038 (7th Cir. 2002) ("[T]he City cannot blindly invoke safety and congestion concerns without more."). Here, the Court takes judicial notice of the fact of widespread protests in Seattle in the summer of 2020, several of which gave rise to rioting resulting in property damage and casualties. *See* Fed. R. Evid. 201(b)(1) ("The court may judicially notice a fact that is not subject to reasonable dispute because it [] is generally known within the trial court's territorial jurisdiction."); *see supra*, § II; *see also* References, George Floyd protests in Seattle-Wikipedia, available at: https://en.wikipedia.org/wiki/George_Floyd_protests_in_Seattle (including citations to over 100 sources reporting on protests in Seattle during summer of 2020); *Black Lives Matter Seattle*, 466 F. Supp. 3d 1206 (challenging SPD's use of flash bang grenades, tear gas, and foam-tipped bullets). There is a more-than-sufficient "basis in the record" here showing a threat of potential

ORDER - 16

violence, and the consequences of SPD failing to anticipate violence and take adequate crowd-control measures *before* a peaceful demonstration becomes a riot.

Furthermore, while acknowledging that the Plaintiff in this case was acting with restraint at the time, the Court also notes that there is ample evidence that during the Defend rally specifically, tempers on both sides of the crowd-control fencing were running high, even menacing. In the checkpoint video, for example, one Defund counter-protestor can be heard shouting at the officer who was trying to explain the fencing, "Who gives a fuck what this guy thinks? . . . You mace nine-year-olds you fucker." Haselton Decl., Ex. 1, at 1:03; 3:50 ("Racist! . . . You're a fucking joke."). On the inside of the fence, the Defend protestor's aggressive thrusting of a flag between Haselton and Daviscourt during their confrontation, and the eagerness of other Defend protestors to become involved in Haselton's attempt to engage Daviscourt in dialogue, could easily have turned physical. The asserted risk here was not necessarily that Haselton himself would become violent, or even that a single protestor would react violently in response to Haselton's speech, but that based on the historical facts of that extraordinary summer, there was a particular need to "manage protests, demonstrations, and marches" and to take minimal precautionary measures to ward off the "rioting which involved violent acts, setting of fires, and looting," and the resulting "acts of violence, injuries to Officers, and significant property damage" those riots caused, *while allowing both sides to continue to demonstrate*. LePierre Decl., Ex. 1, IAP at 2.

Recognizing this threat is not crediting the reprobate "heckler's veto," the "impermissible content based restriction on speech where the speech is prohibited due to an anticipated disorderly or violent reaction of the audience." *Startzell v. City of Philadelphia*, 533 F.3d 183, 200 (2008) (finding restriction on speech was not a heckler's veto where "the police understood

ORDER - 17

Appellants had rights under the First Amendment to express their message, but in directing Appellants to move to another location within [event] they were merely imposing a content-neutral time, place, or manner restriction"). No one's speech here was "vetoed" or "prohibited," and as discussed above, particularly not based on its content. SPD's reliance on the carefully calibrated restrictions imposed here to mitigate the demonstrated risk of violence, on the contrary, allowed individuals on both sides to continue to freely and safely express their message. These limited restrictions were far preferable to what several events that summer showed could be an unfortunate alternative: not just harm to property and persons, but a temporary emergency shutdown of *all* free expression. As much as our society prizes individual liberties, there is no doubt that on occasion, and under carefully prescribed circumstances, the rights of individuals must be modified for the safety of the whole. *See Cox v. State of La.*, 379 U.S. 536, 554 (1965) ("The rights of free speech and assembly, while fundamental in our democratic society, still do not mean that everyone with opinions or beliefs to express may address a group at any public place and at any time. The constitutional guarantee of liberty implies the existence of an organized society maintaining public order, without which liberty itself would be lost in the excesses of anarchy."). That constitutional balance of narrow tailoring to achieve a significant interest was achieved in this case.

(3) *Whether Restrictions Left Open Adequate Alternative Channels of Communication*

The final inquiry in determining whether a time, place, and manner restriction is constitutional is whether it leaves open ample alternative channels of communication. *Ward*, 491 U.S. at 791; *Menotti*, 409 F.3d at 1128 (citing, inter alia, *Frisby v. Schultz*, 487 U.S. 474, 481 (1988)). "The Supreme Court generally will not strike down a governmental action for failure to leave open ample alternative channels of communication unless the government enactment will

ORDER - 18

foreclose an entire medium of public expression across the landscape of a particular community or setting." *Menotti*, 409 F.3d at 1138 (citations omitted). Accordingly, the threshold for this test is not high, and was met in this case.

Plaintiff argues that alternative channels available here were not sufficient, because they did not allow him to reach his intended audience: both Daviscourt specifically and the Defend protestors generally. Pl.'s Rep. at 9. To the extent Plaintiff means to argue he has a First Amendment right to directly address a specific private person at the time and place of his choosing and against that person's wishes, he has failed to cite any authority in support, and it is a proposition the Court rejects. *See Bay Area Peace Navy v. United States*, 914 F.2d 1224, 1229 (9th Cir. 1990) ("[T]he First Amendment does not guarantee the right to communicate one's views at all times and places or in any manner that may be desired."). Furthermore, to the extent Plaintiff is claiming he was unable to address the Defend protestors generally, his unsupported assertion is patently contradicted by the evidence. *See, e.g.*, Haselton Decl., Ex. 1. It is evident from Plaintiff's own video footage that the two sides had ample access to each other, both visually and aurally, and that the City's restrictions here left open to Plaintiff and his fellow counter-protestors ample alternative channels of communication. Whether the two sides were *actually* communicating is not an issue that either the First Amendment or this Court is equipped to address.

For the foregoing reasons, the Court concludes that the Individual Defendants did not violate Plaintiff's First Amendment rights by enforcing the reasonable time, place, and manner restrictions in this case. Plaintiff's First Amendment claims against the Individual Defendants are dismissed.

ORDER - 19

**b. Fourth Amendment Claims: Whether Officers Had Probable Cause to Arrest**

Plaintiff has also asserted a Fourth Amendment claim for unlawful seizure stemming from his arrest after he refused officers' orders to leave the Defend protest zone. Compl., ¶ 5.2. Defendants claim the officers had probable cause to arrest Plaintiff for "Obstructing a Public Officer" under SMC § 12A.16.010(A)(3), which makes it unlawful for someone intentionally to refuse "to cease an activity or behavior that creates a risk of injury to any person when ordered to do so by a public officer," "with knowledge that the person obstructed is a public officer." Plaintiff denies that the officers had probable cause to arrest him under this ordinance, arguing that (1) the restrictions on Plaintiff's speech that the officers were attempting to enforce violated the First Amendment and were therefore not lawfully enforceable; and (2) there is an absence of evidence in the record that Plaintiff's actions created a "risk of injury" to anyone.

Having already rejected the premise of Plaintiff's first argument, the Court turns to the second. Plaintiff characterizes his behavior as "entering a public park and exercising his free speech rights." Pl.'s Rep. at 11. As discussed more fully above, however, the reasonableness of the officers' concerns about the "risk of injury to any person" was supported by the highly publicized riots of that summer and SPD's plan, expressly designed to mitigate the risk of "acts of violence" and "injuries to Officers," to create a separation between groups for the August 1 rally. IAP at 2. The reasonableness of those concerns was further supported by the officers' first-hand observations of Plaintiff not merely voicing his opinions within the rally zone, but directly confronting (indeed, "harassing") one Defend protestor in particular and following her around the rally area against her express will, even as she slowly walks away, backwards, up a flight of stairs, to the point at which other protestors felt compelled to become involved in defending her. Haselton Decl., Ex. 2. Under these circumstances, the Court has no trouble concluding that a

ORDER - 20

1    reasonable officer could have believed that Plaintiff's actions created a risk of injury to himself,

2    to other protestors in the plaza, and/or to officers on the scene. Having probable cause to effect

3    an arrest, therefore, the officers did not violate Plaintiff's Fourth Amendment rights. *See*

4    *Gonzalez v. United States Immigr. & Customs Enf't*, 975 F.3d 788, 817 (9th Cir. 2020) (alluding

5    to "the primacy of probable cause in the evaluation of whether a warrantless arrest comports with

6    the Fourth Amendment," and noting "when an officer has probable cause to believe a person

7    committed even a minor crime ... the arrest is constitutionally reasonable.") (citing *Virginia v.*

8    *Moore*, 553 U.S. 164, 171 (2008)).

9

10           **2.   Claims Against the City of Seattle**

11           Defendants move for summary judgment on Plaintiff's claims against the City, albeit by

12   scant argument contained in a footnote.[7] Defendants argue "a threshold requirement is that a

13   constitutional violation have occurred. As none occurred, any such claim would also fail and the

14   City would be granted summary judgment and dismissal." Defs.' MSJ at 7, fn. 3.

15           Under certain limited circumstances, a *Monell* claim may survive dismissal of

16   constitutional claims against individual officials. *See, e.g., City of Canton v. Harris,* 489 U.S.

17   378 (1989) (violation for failure to train employees). There is no argument that these

18   circumstances are presented here. Accordingly, Plaintiff's *Monell* claims against the City of

19   Seattle are also dismissed. *See Scott v. Henrich*, 39 F.3d 912, 916 (9th Cir. 1994) (holding that

20   "municipal defendants cannot be held liable because no constitutional violation occurred").

21

22

23

24

25   ---
     [7] Defendants take the mistaken position that Plaintiff has failed to state a *Monell* claim against the City, which
     clearly has. *See* Compl., ¶ 4.31 ("The consistency and coordination of action among all officers present, including

26   the on-site supervisor Sgt. Ziemer, along with Officer Ross' comment that he was "just following orders," show that
     the individual defendants acted pursuant to and because of an SPD policy, practice, or custom."). Because the Court
     concludes that no constitutional violation took place, however, this error is inconsequential.

     ORDER - 21

**C.  Plaintiff's Motion for Summary Judgment**

For the reasons stated above, Plaintiff's Motion for Partial Summary Judgment is denied.

**IV.    CONCLUSION**

For the foregoing reasons, Plaintiff's Motion for Partial Summary Judgment is DENIED.

Defendants' Motion for Summary Judgment is GRANTED. This matter is dismissed.

SO ORDERED.

Dated:  October 20, 2023.

_____
Barbara Jacobs Rothstein
U.S. District Court Judge

ORDER - 22